# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Northrop Grumman Corporation | )     ASBCA No. 60190 |
| | ) |
| Under Contract No. N68936-05-C-0059 | ) |

APPEARANCES FOR THE APPELLANT:    Terry L. Albertson, Esq.
    Stephen J. McBrady, Esq.
     Crowell & Moring LLP
     Washington, DC

APPEARANCES FOR THE GOVERNMENT:    E. Michael Chiaparas, Esq.
     DCMA Chief Trial Attorney
    Robert L. Duecaster, Esq.
     Trial Attorney
     Defense Contract Management Agency
     Chantilly, VA

## OPINION BY ADMINISTRATIVE JUDGE PEACOCK[1]

This appeal resolves the "quantum phase" of the parties' disputes regarding a government disallowance, totaling $253,361,512, of post-retirement benefit (PRB) costs associated with the "transition" of Northrop Grumman Corporation (NGC or appellant) from its "pre-transition" accrual methodology to the methodology prescribed in FAR 31.205-6(o). In our "entitlement phase" decision, we concluded, *inter alia,* that NGC failed to accrue its PRB costs in the manner specified in that provision and remanded "quantum" issues to the parties for resolution. *Northrop Grumman Corporation,* ASBCA No. 57625, 14-1 BCA ¶ 35,501, *aff'd on recon.,* 14-1 BCA ¶ 35,743. Familiarity with that decision is presumed. We conclude that the government suffered no damages as a result of appellant's noncompliance with the FAR 31.205-6(o) accrual methodology. Accordingly, the disallowance was improper and we sustain the appeal.

---

[1] Administrative Judges Mark Stempler and Jack Delman, who participated in the prior "entitlement phase" opinions of the Board, have retired.

## FINDINGS OF FACT

### A. Background

1. Prior to 1995, for government contract accounting and tax purposes, NGC accounted for PRB costs associated with its Northrop Retiree Health Plan (the Plan) using an accrual costing method that conformed with the provisions in the Deficit Reduction Act of 1984 (DEFRA) and generally accepted actuarial principles. There is no dispute that the use of that method prior to 1995 complied with government contract accounting requirements. (APF ¶ 1)[2]

2. From 1995 until November 2006, for government contract accounting and tax purposes, NGC continued to account for the PRB costs associated with the Plan using the DEFRA method. NGC documented its accrual costing method in the company's cost accounting standards (CAS) Disclosure Statement that was reviewed and approved by the government. No allegation was made during that period that NGC's accounting for the Plan's PRB costs using the DEFRA method was noncompliant with NGC's disclosed practices or with CAS. Further, during that period, no unallowable Plan costs were identified by DCAA in any audit of the NGC Corporate Home Office final indirect cost submissions for any period between 1995 and 2005 (the last year audited). (APF ¶ 2)

3. In December 1990, the Financial Accounting Standards Board (FASB) issued a rule titled "Employers' Accounting for Postretirement Benefits Other than Pensions," which is referred to as "Financial Accounting Standard 106" or "FAS 106." For financial reporting purposes, FAS 106 required all companies covered by FASB requirements to account for costs using a specific accrual costing

---

[2] Because of the phased processing of this dispute and the multiple evidentiary records in both the entitlement and quantum phase appeals, the Board issued a Briefing Order requiring the parties to propose, in their initial post-hearing briefs, numbered and detailed findings of fact with supporting citations to the record compiled in both phases of the dispute. In their reply briefs, the parties were further directed by the Board to note specific objections to the proposed findings and citations to the record in the opposing party's initial brief, if any. The reply briefs confirm that the facts in this appeal are not substantively in dispute and have been in essence "stipulated" pursuant to the ordered briefing process. Accordingly, the Board's findings rely heavily on the excellent briefs prepared by both parties and we have adopted undisputed (or undisputed portions) of the parties' proposed findings as our own factual findings, without the undisputed, accompanying supporting citations to the record. Appellant's proposed findings and the government's proposed findings are identified as APF or GPF respectively.

2

method. The FAS 106 accrual methodology differed from that required by DEFRA. (APF ¶ 3)

4. FAS 106 required the recognition, for financial reporting purposes, of net periodic PRB costs over the working lives of employees earning PRBs, such that the employer's obligation for each employee's PRBs would be fully accrued by the time the employee attains full eligibility. Unlike FAS 106, the DEFRA accrual method does not factor in expected future increases in medical costs due to either increased usage of medical services by plan participants or the general increase in the cost of medical services until the year in which the resulting cost increases are experienced. The result of the difference, keeping all other factors the same, is that annual costs computed under DEFRA tend to start lower and increase over time while annual costs computed under FAS 106 tend to start higher and then decrease over time. (APF ¶ 4)

5. NGC implemented FAS 106, for financial reporting purposes only, on 1 January 1991. NGC continued to use the DEFRA method for government contract cost accounting purposes until 1 November 2006. NGC's PRB costs calculated during this period were less than the costs would have been had NGC instead used FAS 106 to measure and assign costs. (APF ¶ 5)

6. In 2006, NGC initiated a discussion with DCMA concerning NGC's Plan to reduce future PRB costs and requested an advance agreement with DCMA pursuant to which NGC would continue using the DEFRA method for calculating PRB costs. DCMA declined to enter into such an advance agreement. NGC then proposed to DCMA that NGC adopt FAS 106 for government contract accounting purposes coincident with the changes NGC was contemplating in plan policy. In order to avoid any disagreement about the impact of the adoption of FAS 106 for contract costing purposes, NGC also requested an advance agreement with DCMA that would expressly permit NGC to measure PRB costs in accordance with the delayed recognition methodology described in FAS 106. Again, DCMA ultimately refused to enter into the proposed advance agreement. (APF ¶ 6)

7. DCMA issued a notice of intent to disallow costs on 26 July 2007. DCMA contended that, effective 27 February 1995, FAR 31.205-6(o)(2)(iii) had required contractors to use only the FAS 106 method to measure and assign costs of PRB plans. DCMA also contended that FAR 31.205-6(o)(3) required that PRB costs be funded by the contractor's federal income tax return date to be allowable. Based on these contentions, DCMA asserted that PRB costs that would have been assignable to prior years using the FAS 106 method, but that were not funded, paid, or otherwise liquidated by the tax return date, were not allowable in any subsequent year. Because NGC had used the DEFRA method to calculate PRB costs for government accounting purposes and Plan funding in prior years, its funding amount was less than the full amount that would have been assignable in prior accounting periods using the FAS 106 method.

3

DCMA contended that the so-called "additional" PRB costs–costs calculated under the FAS 106 method since 27 February 1995, which NGC had not previously claimed or funded were therefore not allowable in future periods. (APF ¶ 7)

8. DCMA issued a "Final Determination" to disallow PRB costs on 9 April 2008. In response, in June 2008, NGC presented a briefing to DCMA. On 11 July 2008, the DCAA issued an audit report regarding the Plan. DCAA concluded that $253,361,512 of PRB costs were unallowable due to NGC's failure to fund Plan costs that would have been assignable under the FAS 106 method from 28 February 1995 to 31 October 2006. (APF ¶ 8)

9. The DEFRA method of accounting did not assign to any year prior to 2007 any portion of the $253 million identified as unallowable in the DCAA audit report. NGC has never claimed or otherwise sought to recover the PRB costs that DCAA identified as unallowable in the 2008 audit report. Under the DCAA argument, the $253 million that had not been claimed prior to NGC's use of the FAS 106 method for government contract costing purposes would be unallowable and unrecoverable in future years. (APF ¶ 9)

10. NGC submitted a certified claim to DCMA on 20 May 2010. In its claim, NGC identified multiple reasons supporting allowability of the "additional" PRB costs, i.e., the unfunded costs that could have been charged to the government under FAS 106 between 27 February 1995 and 31 October 2006, but were not because NGC used the DEFRA method rather than the FAS 106 method. Because the 26 July 2007 initial notice of intent to disallow costs and the 9 April 2008 Final Determination to disallow costs did not list the affected contracts, include an estimated dollar value, or describe the potential impact on billing rates and forward pricing rates, NGC based the total amount claimed on the $253,361,512 amount alleged to be unallowable by the DCAA in its 11 July 2008 Audit Report and identified the captioned contract as a "test" contract that would determine the allowability of $6,232.11 for purposes of the claim and any appeal that might be necessary. (APF ¶ 10)

11. The Defense Corporate Executive (DCE) issued a final decision on 18 February 2011 denying NGC's claim. NGC filed a timely appeal from that decision. (APF ¶ 11)

B.     FAR 31.205-6(o) and the Regulatory Framework for PRB Accounting

12. The parties stipulated to the version of FAR 31.205-6(o) in effect as of 22 September 2005 (the date of award of the "test" contract). Under the relevant provisions of FAR 31.205-6(o), NGC was permitted either (1) to recover its PRB costs on a cash basis as it actually paid the retiree medical expenses (referred to as pay-as-you-go (PAYGO) accounting) or (2) to accrue the costs as the benefits were earned during the

4

working lives of the employees (i.e., before those employees retired and the benefits were actually paid). NGC elected to accrue the costs for the Plan.[3] (APF ¶¶ 12-13)

13. Regardless of whether a contractor uses a cash/PAYGO method or an accrual method to account for its PRB costs, the present value of the total cost eventually incurred by the contractor to provide the PRBs will be the same. The principal difference between PAYGO and accrual accounting is one of timing. Generally, accrual accounting recognizes costs as the benefits are earned, but before they are actually paid, accrual accounting produces higher costs than PAYGO accounting in early years and lower costs in later years, but the ultimate sum paid for benefits to plan participants will be the same. (APF ¶ 14)

14. Another important difference between PAYGO and accrual accounting is the method used to measure and assign the cost. Measurement of PAYGO costs involves no judgment or choice–costs are recognized equal to the amount of benefits that are actually paid. Accrual accounting is more complicated, particularly for costs like PRBs that will be paid many years in the future. For accrual accounting, the future costs must be estimated on the basis of actuarial assumptions that include factors such as the life expectancy of the retirees and their eligible dependents likely future benefit costs, the investment return on the amounts set aside in trust accounts and other actuarial variables. As a result, calculation of accrued PRB costs is an actuarial calculation. NGC engaged external actuaries to compute the annual cost based on data the company provided. (APF ¶ 15)

15. Prior to FAS 106, most companies had been accounting for and reporting PRB liabilities on a PAYGO basis in financial reports. Because most companies had to "transition" from PAYGO to accrual accounting for PRB costs to comply with FAS 106, FAS 106 also addressed how that "transition obligation" should be reported. The "transition obligation" consists of PRB costs that were earned, but not paid, accrued or funded before FAS 106 became effective. FAS 106 permitted companies to choose one of two alternatives for recognizing the transition obligation: either (1) immediate recognition of the entire transition obligation in the year of the transition; or (2) recognition of the obligation on a delayed basis, typically over twenty years. For financial reporting purposes, virtually all companies, including NGC, elected to use the immediate recognition method at the time of the transition to FAS 106 for financial accounting purposes. (APF ¶ 16)

---

[3] NGC had a number of other plans that provided post-retirement medical benefits to employees and former employees who were not covered by the Plan in dispute. The costs of these other plans were recovered on a PAYGO basis and are not at issue.

5

16. The adoption of FAS 106 also triggered changes to the allowable cost regulations. Prior to 1991, there was no specific provision in the FAR or in predecessor regulations addressing PRB costs; PRB costs were instead covered only by the general provisions in FAR 31.205-6(m) concerning the allowability of fringe benefits. In response to the promulgation of FAS 106 in 1991, subsection (o) was added to FAR 31.205-6 as an interim rule. Unlike FAS 106, the FAR provision permitted contractors to continue to use PAYGO accounting for PRB costs, and new subsection (o) also specifically permitted accrual accounting and addressed, for the first time, the allowability of PRB costs calculated on an accrual basis. The revised regulation provided in pertinent part:

> (2)...In addition, to be allowable in the current year, PRB costs must be paid either to an
>
> (i) insurer, provider, or other recipient as current year benefits or premiums, or (ii) an insurer or trustee to establish and maintain a fund or reserve for the sole purpose of providing PRB to retirees. The costs in paragraph (o)(2)(ii) of this subsection must also be calculated in accordance with generally accepted actuarial principles and practices as promulgated by the Actuarial Standards Board, and be funded by the time set for filing the Federal income tax return or any extension thereof. PRB costs assigned to the current year, but not funded or otherwise liquidated by the tax return time, shall not be allowable in any subsequent year.
>
> (3) Increased PRB costs caused by delay in funding beyond 30 days after each quarter of the year to which they are assignable are unallowable.

The drafters' comments explained the purpose of the new subsection as follows: "The purpose of the FAR rule is to establish a clear requirement that contractor accruals of PRB costs must be funded to be allowable." There was and is no requirement in FAS 106 that accrued PRB costs be funded and most companies subject to FAS 106 do not fund PRB liabilities on an accrual basis. Like the FAR provision, however, DEFRA required that accrued costs be funded in order to be deductible for federal income tax purposes. (APF ¶ 17)

17. Another interim rule issued two months later added a specific reference to FAS 106 in subparagraph (o)(4) to limit assignment of transition obligation costs:

6

(4) Costs of postretirement benefits attributable to past service ("transition obligation") as defined in Financial Accounting Standards Board Statement 106, paragraph 110, are allowable subject to the following limitation: The allowable amount of such costs assignable to a contractor fiscal year cannot exceed the amount of such costs which would be assigned to that contractor fiscal year under the delayed recognition methodology described in paragraphs 112 and 113 of Statement [FAS] 106.

The drafters' comments focused on the limits of allowability, explaining that the new subparagraph (o)(4) "limits the allowable amount of contractor PRB transition costs for any fiscal year to the amount which would be assigned to that year using the amortization method described in FASB Statement No. 106." (APF ¶ 18)

18. A final rule issued in December 1994 took effect on 27 February 1995 and provided in part:

(iii) Accrual basis. Accrual costing other than terminal funding must be measured and assigned according to Generally Accepted Accounting Principles and be paid to an insurer or trustee to establish and maintain a fund or reserve for the sole purpose of providing PRB to retirees. The accrual must also be calculated in accordance with generally accepted actuarial principles and practices as promulgated by the Actuarial Standards Board.

....

(3) To be allowable, costs must be funded by the time set for filing the Federal income tax return or any extension thereof. PRB costs assigned to the current year, but not funded or otherwise liquidated by the tax return time, shall not be allowable in any subsequent year.

(APF ¶ 19)

19. The drafters' promulgation comments to the final regulation stated that "it is intended that the methods allowed by CAS for prefunding retiree insurance programs be allowable for all contractors." The only cost accounting standards provision that deals with prefunding retirement insurance costs is CAS 416. CAS 416.50(a)(1)(v)(A). It is

7

undisputed that the DEFRA method used by NGC from 1995 to 2006 to account for PRB costs complies with the requirements of CAS 416. (APF ¶ 20)[4]

20. The major difference between the DEFRA and FAS 106 calculation is that FAS 106 includes health care cost trend rates, i.e., medical cost escalation, and DEFRA does not (APF ¶ 24). Under DEFRA, PRB costs must be computed "on the basis of current medical costs" (APF ¶ 22).

21. NGC's PRB costs from 1995 to 2006 (sometimes referenced herein as the "pre-transition" fiscal years) using DEFRA for government contracting purposes were lower than what its PRB costs would have been using FAS 106. If NGC had used the FAS 106 method instead of DEFRA, the costs assigned to that period would have been approximately $253 million more (the amount of the disallowance) than were assigned under DEFRA. (APF ¶ 23)

22. At some future point, costs calculated using the DEFRA method would exceed FAS 106 calculated costs, barring reduction in Plan benefits. NGC's position is that when and if the cross-over occurred, allowable costs would be limited to the amounts calculated using FAS 106 (pursuant to FAR 31.201-2(c)). (APF ¶ 24 n.11)

C.    Appellant's Accrual Practices and Development of Dispute

23. Although this dispute concerns the 11-year time period 1995-2006, for at least the 21-year time period 1985-2006, NGC accounted for Plan PRB costs in accordance with DEFRA (APF ¶ 26). At all times between 1995 and 2006, NGC disclosed to the government in its CASB Disclosure Statements that it accounted for the Plan's PRB costs in accordance with DEFRA (APF ¶ 27). The government never objected to NGC accounting for PRBs in accordance with DEFRA at any time during the 11-year period 1995-2006 and gave NGC no reason to suspect that its use of DEFRA was noncompliant. Neither NGC nor the government calculated the delta between FAS 106 and DEFRA for government contracts purposes during that time period. (APF ¶ 35) Throughout 1995-2006, the DCE, as required by FAR 30.207(a) and (b), issued multiple compliance letters in response to NGC's disclosure statements. These letters always indicated that NGC's use of DEFRA was compliant with CAS and FAR and that there were "no instances of noncompliance with applicable Cost Accounting Standards or FAR Part 31 cost principles." (APF ¶ 37)

24. Although DCMA's position in this litigation is that NGC should have changed its accounting practice from DEFRA to FAS 106 in February 1995, when the revision to FAR 31.205-6(o) concerning generally accepted accounting principles (GAAP) compliant

---

[4] The government has not advanced any issues regarding compliance with the CAS or associated regulations.

8

accounting methods became applicable, the DCMA PRB experts at its CIPR (Contractor Insurance Pension Reviews) division took the opposite position prior to and after the commencement of this litigation. Senior DCMA actuary Mr. George Matray testified that in late 1999 he drafted the CIPR Division Technical Position Paper. That document, used for internal training of CIPR actuaries, states that DEFRA is an acceptable actuarial cost method for purposes of the regulation, that it complies with the requirements of CAS 416, and that the difference between the lower DEFRA that amount was charged to the government and the higher FAS 106 amount that could have been charged (i.e., the "ceiling"), does not become unallowable because it was not assigned during that year. (APF ¶ 40)

25. Although the CIPR team raised the issue of NGC's use of DEFRA in 2004 internally, it ultimately concluded that NGC's accounting practice was compliant and no one from the CIPR team raised the issue with NGC. In March 2004, the position that some portion of NGC's PRB costs would become "forever unallowable" was first raised by DCMA in a series of internal emails among members of the DCMA CIPR team. Mr. Reginald Nichols, who is not an actuary but who is a member of the CIPR team on the West Coast, asked whether the team should put NGC on notice that its accrual of costs using DEFRA might be noncompliant with FAR accrual requirements and might be creating "forever unallowable" costs in future years. Mr. Ed Espiritu (another CIPR team member in Los Angeles), Mr. Matray (the senior DCMA actuary in New York), and Mr. Ring (an actuary and the DCMA policy expert on CIPR matters in Washington) concluded that NGC's method was compliant with the relevant requirements and communicated that conclusion to Mr. Nichols. They concluded that the DEFRA method was an acceptable actuarial method, that it complied with the requirements of CAS 416, that it produced costs that were less than the maximum costs permitted by FAR, and that there was accordingly no need to provide any notice to NGC about any potential noncompliance. Therefore, the CIPR team concluded that the issue should be "buried." (APF ¶ 41)

26. Both Mr. Matray and Mr. Ring testified at the entitlement hearing that they continue to believe that NGC's use of DEFRA from 1995 to 2006 complied with CAS and FAR, and that the CIPR Division Technical Position Paper correctly interprets the regulations (APF ¶ 42).

27. In 2006, NGC was approaching the time when its PRB costs calculated under FAS 106 were likely to reach the "crossover" point, i.e., the point at which the DEFRA costs would begin to exceed the FAS 106 costs, and NGC considered amending its PRB plan to limit the impact of future increases in medical costs (and therefore stay below the FAS 106 ceiling), but to continue accounting for PRBs in accordance with DEFRA after making that change. NGC preferred DEFRA to FAS 106, in part, because DEFRA provided a more predictable cost pattern. (APF ¶ 48)

9

28. NGC discussed the possible changes with the DCAA auditor who had been primarily responsible for auditing NGC's PRB costs during most of the period at issue. In those conversations, the auditor suggested that the DEFRA method was not compliant with the FAR and that NGC might have created a pool of "forever unallowable" costs by failing to accrue and charge the maximum amount permitted by the FAR. (APF ¶ 49) After discussing this issue with the auditor, NGC formally disclosed to the DCMA DCE, that it was considering a plan to reduce future PRB costs and requested an advance agreement with DCMA pursuant to which NGC would continue using the DEFRA method for calculating PRB costs, regardless of whether they exceeded the FAS 106 costs. DCMA refused to enter into such an agreement. NGC then proposed to DCMA that NGC adopt FAS 106 for government contract accounting purposes effective at the same time as the Plan policy changes. In order to avoid any disagreement about the impact of the adoption of FAS 106 for government contract costing purposes, NGC also requested an advance agreement with DCMA that would expressly permit NGC to measure PRB costs at the time of the change in accordance with the delayed recognition methodology described in FAS 106. DCMA also declined to enter into that advance agreement. (APF ¶ 50)

29. Effective 1 November 2006, NGC adopted the FAS 106 method for government contract accounting purposes. Concurrently, also effective 1 November 2006, NGC adopted a Plan design change (amendment) that capped future benefit increases for participants in all plans, including the Plan at issue in this case. The combined effect of those two changes was to reduce PRB costs substantially for government contract accounting purposes in periods after the changes. (APF ¶ 51)

30. NGC has, since 2007, included a 20-year amortized portion of the transition obligation, in its incurred cost submissions. It has also been deducting an amount from its incurred cost submissions that corresponds to a 20-year amortization of the unfunded FAS 106 costs that total $253,361,512. This deduction is pursuant to the DCE's determination that the unfunded 1995-2006 costs are unallowable costs in years subsequent to 2006. (GPF ¶ 8)

31. From 1995-2006, NGC consistently disclosed its accounting practice of measuring and assigning PRB costs in accordance with DEFRA, and consistently followed that accounting practice; and the government consistently approved this accounting practice (APF ¶ 52).

32. In the final decision, the government took the position that, "Because Northrop chose not to measure and assign PRB costs from 1991 to 2006 using the required GAAP method, it may not now charge out-of-period costs which were allocable, if at all, to prior periods" (APF ¶ 53).

10

33. When NGC changed its accounting practice from DEFRA to FAS 106 in 2006, it simultaneously made substantial reductions in future Plan benefits. Effective 1 November 2006, NGC amended the Plan by capping future benefits at fixed dollar amounts. The effect of the 2006 Plan Amendment was to ensure that NGC would not have to pay PRB costs arising from future increases in healthcare costs in excess of the fixed dollar "cap." (APF ¶ 61)

34. The 2006 Plan Amendment was a "negative plan amendment." FAS 106 prescribes how changes in plan benefits, including negative plan amendments, should be reflected in calculation of PRB costs. Pursuant to FAS 106, paragraph 28, the accumulated post-retirement benefit obligation (APBO) that was calculated when FAS 106 was first adopted–and which was used to compute the transition obligation when NGC transitioned to FAS 106 for government contract purposes effective 1 November 2006–was required to exclude obligations associated with the future health care cost increases that were eliminated pursuant to the 2006 Plan Amendment. (APF ¶ 62) Because NGC executed the negative plan amendment reducing future benefits, FAS 106 required NGC to remove approximately $307 million from the APBO for the Plan (APF ¶ 63). The $307 million was removed from NGC's APBO *before* NGC calculated the transition obligation (APF ¶ 64).

35. NGC's transition obligation for government contract purposes was calculated by outside actuaries for the company, and reviewed by NGC's senior actuary (APF ¶ 65). The only independent expert actuarial testimony at the "Quantum Phase" hearing was given by appellant's expert Mr. John McQuade. Mr. McQuade concluded and we find that by eliminating $307 million in future medical cost trend from the APBO, the 2006 Plan Amendment actually eliminated more than the $253 million of unfunded costs at issue in this case. Because the costs that were eliminated before computing the transition obligation were the same costs that comprised the $253 million of unfunded pre-transition costs, it would not have been possible for NGC to include the $253 million of unfunded costs in its calculated PRB costs in 2007 or thereafter, which in turn means that NGC could not have claimed those costs in the 2007-2026 period. Mr. McQuade's conclusions were substantially corroborated and concurred in by the NGC's former senior actuary, whom the Board finds was highly credible. (Joint Quantum R4 (JQR4), tab 89, §§ II-III; tr. 1/109, 121-24, 164-66, 2/53-55, 64-67) The government presented no testimony or report from an actuarial expert rebutting the conclusions of appellant's senior actuary and its actuarial expert, Mr. McQuade. The only government actuarial witness in this appeal was called by appellant and agreed with the analysis of Mr. McQuade (APF ¶ 69; tr. 1/108-10).

36. None of the $253 million disallowed in the final decision has been claimed by NGC in 2007 or any subsequent year. The $253 million disallowed represents the "lion's share" of the $306 million APBO calculated pursuant to FAS 106 that would have been assigned had it not been eliminated/reversed by the 2006 Plan amendment.

(JQR4, tab 29; tr. 2/52-55, 63-67) NGC's use of DEFRA from 1995-2006, and subsequent Plan Amendment and transition to FAS 106 in 2006, did not lead to any recovery of claimed but unfunded costs, or to duplicate recovery (*id.*; tr. 1/204-66, 2/31; APF ¶ 71).

DECISION

This is the "quantum" phase of the resolution of the parties' dispute regarding the allowability of appellant's PRB costs. Previously in the "entitlement" phase, the Board determined that, for government contract accounting purposes, NGC failed to measure, accrue, assign and fund its PRB costs in accordance with FAS 106 and FAR 31.205-6(o) allowability criteria during FYs 1995-2006, prior to NGC's 2006 "transition" to the FAR-compliant methodology. The quantum consequences of that noncompliance are now before us for decision. The Board's "entitlement" decision held that FAS 106 via the FAR controlled the allowability of PRB costs. We did not definitively address the "quantum" or damages consequences of noncompliance with FAS 106 requirements. We conclude for the reasons detailed below, that the government unreasonably interpreted the cost principle and ultimately suffered no damages as a result of appellant's use of DEFRA from 1995-2006 for government accounting purposes because of appellant's 2006 Plan amendment implemented concurrently with NGC's transition to FAS 106.

The government has summarized its position as follows:

> From 1995 through 2006, NGC measured, assigned, and funded the costs of the Plan using a FAR noncompliant accounting method. During this time, NGC funded the Plan with less than what it would have funded had it used the FAR compliant method. In November 2006, Appellant started to comply with the FAR by beginning to account for the Plan's costs using the FAR compliant accounting methodology. This switch to the FAR compliant methodology ("GAAP/FAS 106") necessitated the calculation of a transition obligation to account for this shortfall in funding. NGC has been and continues to include an amortized portion of this transition obligation in its incurred cost submissions since 2007. The FAR section at issue disallows that portion of the transition obligation that is attributable to NGC's choice not to fund costs of the plan in accordance with GAAP/FAS 106 prior to 2007. Regardless of what accounting method NGC actually used to measure, assign, and fund the Plan's costs, it incurred costs after 1995 as measured by the GAAP/FAS 106 methodology because the FAR required that methodology

12

to measure and assign PRB costs. Any costs as measured by GAAP/FAS 106 methodology that were not funded by the end of each tax year are unallowable in later years. Appellant's 2006 Amendment that reduced the benefits of the Plan had no effect on the costs that NGC incurred in maintaining the Plan prior to that Amendment.

(Gov't reply br. at 2-3) (Footnote omitted)

## A. The Pre-Transition Years

Although the Board's "entitlement" decision held that the GAAP/FAS 106 requirement was clearly specified, the gravamen of the dispute involves the quantum consequences of appellant's continued use of the DEFRA accrual methodology for measuring and assigning PRB costs during the pre-transition fiscal years. The damages or "quantum" consequences advocated by the government by no means "plainly" follow from the language of the FAR 31.205-6(o). Those consequences are not manifest and are not specifically addressed in the cost principle viewed in isolation. Appellant has presented the only reasonable interpretation of the consequences of noncompliance.

We consider that FAR 31.205-6(o), properly construed, establishes a cost allowability "ceiling," and focuses on whether the contractor *overcharged* the government for PRB costs in its relevant cost-related submissions. There is no dispute that for more than a decade preceding the "transition" NGC did not. From the onset of the FAR requirement in 1995 through 2006, NGC's use of the DEFRA method resulted in the contractor annually charging the government *less* than it could have claimed had it elected to use the FAS 106 methodology for government accounting purposes during those pre-transition years. For that decade, the government unsurprisingly did not object. In fact, the government was well aware that appellant continued to use the DEFRA methodology but repeatedly approved its use as being in compliance with regulatory criteria. The drafters' comments accompanying promulgation of the pertinent revisions of FAR 31.205-6(o) further indicate that other CAS-compliant accrual methods were not prohibited by the regulation. Although we determined in the "entitlement phase" that the government was not bound by its acquiescence and did not waive compliance with the FAR in the pre-transition years, the parties effectively interpreted the cost principle to provide that PRB "costs" computable using FAS 106 criteria served as a "ceiling" on allowability, while permitting use of DEFRA to the extent that DEFRA-measured, accrued and assigned costs did not exceed that "ceiling." Only when the 2006 "transition" issues arose did the government first advocate its current theories.

Interpretation of the provision with respect to "quantum" was not even clear and uniform within the government. The CIPR team's analysis and interpretation differed

13

from that proffered by DCAA and ultimately adopted by the DCE. We consider that the CIPR team correctly interpreted the principle in the first instance. Regardless of their implications relative to appellant's estoppel and corollary course of dealing contentions, the differing internal interpretations by the cognizant DCMA audit and CIPR personnel are relevant to evaluating the "clarity" of the provision regarding the "quantum" consequences of non-compliance as well as the reasonableness of the government's interpretation as ultimately advocated in this litigation. Even within DCAA, there were differing interpretations. For years, DCAA routinely determined that DEFRA-computed costs were allowable because they did not exceed amounts computed using the FAR-consistent, FAS 106 methodology. *See* FAR 31.201-2. The lesser-funded DEFRA-determined costs have never been questioned. The division arose when appellant, after the failure of its attempts to reach an advance agreement with the government approving and memorializing continued use of DEFRA, changed its cost accounting practice[5] regarding PRB costs to comply with the prescribed FAR accrual methodology and switched to FAS 106 for government contract accounting purposes.

The government interpretation advocated in this appeal regarding the pre-transition years also contradicts the general rule regarding the quantum consequences of noncompliance prescribed in FAR 31.201-2(c). That provision states, "When contractor accounting practices are inconsistent with this Subpart 31.2, costs resulting from such inconsistent practices *in excess* of the amount that would have resulted from using practices consistent with this subpart are unallowable." Here, NGC failed to comply with the FAR requirement that allowable costs be accrued in accordance with FAS 106 criteria where an accrual methodology was used by the contractor to determine its allowable PRB costs. Although appellant failed to use the proper accrual methodology, there is no evidence or government contention that the amount accrued by appellant pursuant to DEFRA in the pre-transition years *exceeded* the amount of costs that would have been allowable applying FAS 106 or even an amount calculable for the Plan using the "pay-as-you-go" methodology. In fact, precisely the opposite is true. Moreover, as discussed more fully below, because of the 2006 Plan amendment, recovery of the amount disallowed by the government will never be sought or claimed by appellant in the post-transition years. There is no *excess* to disallow.

More fundamentally from an accounting perspective, the government interpretation assumes that NGC properly could, should, and in fact was *required* to, charge/claim unincurred PRB costs in relevant cost/pricing-related submissions during the pre-transition years. Although the government recognizes that the approximately $253 million "excess" FAS 106 costs in dispute were never claimed or included in any incurred cost or forward pricing proposals for the years in question, it contends that appellant, nevertheless, "incurred" those costs by "operation of law" in accordance with

---

[5] The government has not raised any issues regarding compliance with the Cost Accounting Standards and their implementing regulations.

14

the express requirements of the FAR. No precedent in support of this novel concept is cited.

The government disregards fundamental concepts related to cost "incurrence" and misfocuses on an "allowability" regulation rather than the NGC Plan itself. The foundational assumption of the government interpretation is erroneous and illogical insofar as it relates to the pre-transition years.

Compliance with FAR 31.205-6(o) was only one of the criteria for allowability. Perhaps most basically, to be allowable, the contractor must incur the costs in dispute. Compliance with the government's interpretation of FAR 31.205-6(o) would have placed NGC in violation of that key prefatory requirement for allowability. Appellant did not "incur" the disputed costs in the pre-transition years and, as discussed below, will not "incur" them in the post-transition years as a consequence of the 2006 Plan amendment. If NGC had included non-incurred costs in its various cost, pricing and claim submissions during the pre-transition years, it faced their disallowance for that reason as well as other possible adverse consequences and penalties.

Cost incurrence is driven and defined by the Plan obligations creating NGC's PRB cost benefits and structure. The accounting/actuarial measurement methodologies and requirements developed for, and governing, tax and/or financial/GAAP accounting are not the sole drivers of the amount of PRB costs actually incurred by NGC. The regulatory tail does not wag the Plan dog. The amount measured/incurred, accrued, assigned and funded pursuant to Plan obligations and associated actuarial assumptions may be more or less than required for FAS 106 purposes. For the pre-transition years in question in this appeal, the Plan's DEFRA-based costs were always *less* than costs computable using the actuarial assumptions and requirements of FAS 106. The contractor measured/incurred, accrued, assigned, funded and charged the government *less* than it could have if the Plan had adopted FAS 106 accounting for those periods. Fundamentally, the government should only be concerned where the contractor claims more than permitted by regulation.

The requisite PRB funding levels (and costs flowing therefrom) are for NGC to determine. The accounting obligation triggering "cost" incurrence for the corporation stems from its specific contractual relationship with covered employees and the future benefit levels prescribed therein, i.e., the Plan. There is no dispute that the amounts measured, accrued and assigned to FYs 1995-2006 were compliant with NGC's obligations under its Plan. Just as tax rules and regulations are not the sole driver of business decisions, government contract cost allowability regulations are not the sole criteria for establishing, employee compensation levels generally and PRB funding levels more specifically. Here, NGC's consistent business judgment, both before and after transition, was that it was unnecessary to fully fund future medical escalation costs to the extent required by FAS 106. Appellant determined that it could maintain a quality, competitive workforce without doing so. Consequently, NGC could offer more favorable

15

cost-based pricing to the government under its flexibly-priced contracts. It is illogical and shortsighted for the government to interpret the provision in a manner dictating that appellant *must* charge or *should have* charged the government the full FAS 106 amount, where the contractor determines it is not necessary to pay that full amount to attract and maintain a quality workforce. If NGC had done so, presumptively the excess compensation cost would also be unreasonable as beyond its agreement with covered employees as reflected in the Plan. The assignment and funding requirements are designed to protect the government from paying *excessive* costs. Any "failure" to assign and/or fund, whether the result of the contractor's best business judgment or other factors specific to the contractor, benefits the government. The government's legitimate concern was whether the unfunded "excess" assignable to the non-compliant years would be carried forward and included in the transition obligation and amortized/"incurred" and assigned to future fiscal years. As discussed below, issues raised by the potential inclusion of such unincurred, unassigned and unfunded costs in the transition obligation were effectively mooted by the 2006 Plan amendment.

Company-specific PRB costs in this appeal are not "incurred" for government contract accounting purposes based on generic FAS 106 requirements established for purposes of cross-corporate financial comparisons and standardized public reporting. Nor is the amount of cost "incurred" for government contract accounting purposes determined by, or equal to, allowability maximums calculable under the FAR. The regulation does not dictate PRB benefit levels and costs contractors must incur. It simply and solely sets a ceiling limiting the PRB cost allowable and payable under flexibly-priced government contracts. Prior to transition, the government implicitly recognized this and never alleged that NGC's DEFRA methodology was noncompliant with the FAR or CAS.

The government relies heavily on NGC's failure to fund the excess computable in the pre-transition years using FAS 106 precepts. According to the government, appellant thereafter lost the right to assign, fund and recover the excess in subsequent fiscal years. For government contract purposes, PRB costs must be properly assigned and timely funded to be allowable. Here there is no dispute that NGC fully and timely funded the incurred amounts assigned *by it* to FYs 1995-2006 in accordance with Plan requirements. The government myopically alleges that appellant should have "assigned" more than required by the Plan to each of those years. However, if PRB costs are not incurred, there is no requirement to assign, much less fund, "phantom" costs. There is no evidence or allegation that a major contractor such as NGC would be unable or otherwise fail to fund properly incurred, measured and assigned costs. NGC funds what it properly accrues and assigns. The funding prong of the allowability test has obvious purposes. The requirement ensures that there is no shortfall in the amount funded versus the amount measured, assigned and accrued. Here the government interpretation focuses on funding while disregarding the basics of cost incurrence. Again, it would have been improper for NGC to "assign" and claim costs in excess of the amount incurred. The regulation must

16

be interpreted in the context of and in conformance with basic accounting principles of incurrence, assignment and accrual.

## B. The Transition Obligation and Post-Transition Years

The propriety of the pre-transition DEFRA accounting for the cost is linked to the post-transition accounting. The government's basic premise is that there should not have been any excess attributable to FY 1995 through 2006 if appellant had properly measured and assigned the costs in accordance with FAS 106 and timely funded the amount the government asserts should have been assigned to those accounting periods. The issues presented arose at the time, and as a result of, appellant's computation of the transition obligation. The government was justly concerned with allowability considerations regarding the potential amortization of that obligation. Thus, it developed the unreasonable interpretation of FAR 31.205-6(o) which we have rejected for the reasons detailed above. Among other things, the government misfocused its attention on the regulation as the cost incurrence driver rather than NGC's Plan. There were no "excess," "incurred" PRB costs prior to the transition to disallow. However, to the extent that the amortizable transition obligation included PRB costs that should properly have been assigned to the non-compliant pre-transition years and funded, the government position had merit. The potential existed that the "excess" would be included in the transition obligation to be amortized, incurred, assigned, funded and recovered during the post-transition years.

Recognizing potential allowability issues with the transition obligation, and true to the consistently intended scope and coverage of its Plan with respect to excluding or capping future medical escalation, NGC specifically and expressly executed a "negative" Plan amendment at the time of transition for government contract accounting purposes to the FAS 106 methodology. The 2006 Plan amendment, issued simultaneously with, and closely related to, the transition, ensured that NGC would never incur the costs disallowed and effectively mooted allowability issues associated with the transition obligation and the change in NGC's cost accounting practices related to PRB costs.

As established by the only expert actuarial testimony in the record, we have found that any adverse cost consequences resulting from the change to FAS 106, and potential inclusion of costs properly assignable to the pre-transition years, were reversed and removed as a result of the Plan amendment. The government will not pay the pre-transition "costs" in dispute. They were not, and will never, be incurred, accrued, or assigned. The disputed post-transition FAS 106 costs were not included in the transition obligation having been eliminated prior to its calculation as a consequence of the 2006 Plan amendment. The unrebutted expert testimony to that effect was corroborated by the persuasive testimony of appellant's former senior actuary whom we have found to be highly credible, as well as the only government actuary addressing the issue. The government has failed to sustain its burden of proving that any of the disallowed amount was or will be amortized as part of the

17

transition obligation and claimed during the post-transition years. Its argument is founded on theoretical constructs that have no factual basis or evidentiary support here. In this case, the government's concerns were legitimate, albeit its legal and factual analysis was faulty. NGC removed properly objectionable portions of the transition obligation via the 2006 Plan amendment before computing that obligation. That amendment should have assuaged and eliminated the government's valid concerns here.

Consequently, for the aforementioned reasons, we conclude that the government suffered no damages as a consequence of appellant's use of the DEFRA methodology during the pre-transition years. The contractor has never, and will never, claim, and the government will never pay, amounts disallowed by the final decision. That disallowance was improper as were the associated deductions taken by the government with respect to the amortized amounts of the transition obligation assigned during the post-transition years.

The appeal is sustained.

Dated: 13 July 2017

ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

REBA PAGE
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60190, Appeal of Northrop Grumman Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
